UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GEORGE JOHNSON, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No.: 06-1453 (RCL) |
| | : | |
| SERGEANT BREDET WILLIAMS, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION *IN LIMINE*

I.     INTRODUCTION

COMES NOW the Plaintiff, through counsel, and opposes Defendants' Motion *in limine* to exclude all of Plaintiff's claims from trial in this matter.  Defendants argue that Plaintiff should be precluded from presenting any of his claims to the jury because he "lacks sufficient evidence to prove any of his claims." See Defendants' Motion at 2.  Plaintiff  opposes this motion first and foremost because it is a dispositive motion disguised as a motion *in limine*.  As such, the District has defied this Court's order denying the District's request for leave to file a dispositive motion.   In this same regard, the motion is not substantively a motion *in limine* nor can it be determined by that standard.  Notwithstanding these objections, the District in filing this motion belittles the fact that there remain significantly disputed issues of fact and law which preclude the relief sought.

Plaintiff maintains that his Fourth Amendment rights were violated under the U.S. Supreme Court opinion *Florida v. J.L.*, 529 U.S. 266 (2000), which holds that an anonymous tip that a person of a specific description in a certain location is carrying a gun is, without more,

1

insufficient to justify a police officer's stop and frisk of that person. Plaintiff contends that the anonymous tip in the instant case lacked the requisite indicia of reliability to provide reasonable suspicion to justify an investigatory stop. Plaintiff further contends that the impermissible *Terry* stop in the instant case became an arrest without probable cause and further, that all harm that follows therefrom is actionable.

Most significantly among the disputed issues of material fact in this case, the District we think disingenuously suggests that the police officers on the scene were unaware that the call from the dispatcher referenced an anonymous caller. That fact that they knew the tip was anonymous was carefully pled by Plaintiff in his Complaint at paragraph 13. Moreover, consistent with his discovery response, Plaintiff contends that the officers on the scene told him that the tipster who made the call was anonymous. See Plaintiff's Answers to Interrogatories, attached as Exhibit 4; see also Letter from Police Commander Exhibit 5. *Ipso facto*, the police could not have known unless they were told, and further, there was no other way Plaintiff could have known about the anonymous call while on the scene, given that he never spoke to the dispatcher. This factual tension is monumental and if a jury were to believe Plaintiff, to wit, that the police knew that the caller was anonymous as they detained and threatened Plaintiff, then Defendants' entire "novel" approach is meritless.

It is a longstanding principle of American jurisprudence that credibility determinations, weighing of evidence, and drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether the judge's ruling is on a motion for summary judgment or for directed verdict, and evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. That standard should govern Defendants' request for dispositive relief and

preclude the Court from dismissing Plaintiff's claims on the grounds argued by Defendants. *See*

*Fry v. Diamond Construction, Inc.*, 659 A.2d 241, (D.C.,1995); Fed.R.Civ.P.50(a), 56(c).

Plaintiff will attempt to refute Defendants' arguments, dispositive and otherwise more fully

below.

## II.    FACTUAL BACKGROUND

This case involves police conduct toward a motorist and his passenger who were stopped,

detained, and arrested at gunpoint by at least seven (7) District of Columbia Metropolitan Police

Department (MPD) officers who were responding to an uncorroborated anonymous tip about a

man waving a gun.  See Transcript of 911 call, attached as Exhibit 1.  On December 21, 2005 at

approximately 1:00 a.m., Plaintiff George Johnson ("Johnson") and his passenger, Aisha Kahlil

("Kahlil"), were departing from a performance at 14th and U Streets in the District of Columbia.

It was Johnson's 55th birthday.  Johnson turned left on 13th Street and proceeded to drive north.

At all times referenced herein, he obeyed all traffic laws.  As Johnson approached the

intersection of Georgia Avenue and Piney Branch Road, he noticed police vehicles behind him

and therefore, he stopped his vehicle.  To his absolute surprise, the police officers via

loudspeaker ordered Johnson and Kahlil to exit the vehicle with their hands up.  They complied

and cooperated although they were clueless as to the reasons for the police confrontation.  At

least six police cars surrounded them by the time Johnson and Kahlil had exited his vehicle.  As

they stood outside the car with their hands in the air, seven (7) to ten (10) police had drawn their

loaded guns and directed them at Johnson's head, chest, side and back, yelling and threatening,

while using profanity, that he should keep his hands up or he would be shot.  Both Johnson and

Kahlil were frisked; his wallet and her purse were examined; his license and registration were

checked.  The officers repeatedly threatened to shoot, shouted, cursed and pointed their guns

directly at Johnson and Kahlil even after it was apparent that they were horrified, without

weapons and posed no threat or danger.  In response to Johnson's question as to why he had been

stopped, the officers immediately told Johnson that an anonymous tipster, via telephone, stated

that a man driving a green Ford Explorer had been seen brandishing a gun.  Johnson willingly

consented to a search of his vehicle and no evidence of a weapon or any other criminality was

found.

During and immediately after the incident, Plaintiff became increasingly distraught and

fearful, which caused him to experience a debilitating emotional and physical breakdown.  He

suffered chest pains and was traumatized physiologically to the extent that he was admitted to

Prince George's Hospital for five (5) days, from December 26 through 30.

### III.     ARGUMENT

### A.     Defendants' Motion should be denied because it is untimely and improper.

Defendants' Motion *in limine* should be denied because it is a dispositive motion in

disguise, notwithstanding this Court's Order of August 12, 2008 denying as moot Defendants'

previous Motion to Reopen Dispositive Motions Deadline.  Hence, the substantive issues raised

in Defendants' Motion are untimely.  The scope of Defendants' instant Motion is wholly

inappropriate at this time, far exceeding the *in limine* resolution of specific evidentiary issues

contemplated by Rule 16(c) or FRE 103.  "Motions *in limine* are not to be used as a sweeping

means of testing issues of law," *Provident Life & Accident Ins. Co. v. Adie,* 176 F.R.D. 246, 250

(D.Mich.1997) (denying motion *in limine* because subject of motion should have been raised in a

motion for summary judgment).

The use of motions *in limine* to summarily dismiss a portion of a claim has been condemned, and the trial courts are cautioned not to allow motions *in limine* to be used as unwritten and unnoticed motions for summary judgment or motions to dismiss. *Buy-Low Save Centers, Inc. v. Glinert*, 547 So. 2d 1283 (Fla. Dist. Ct. App. 4th Dist. 1989) (holding that the trial court's granting of a motion *in limine* was tantamount to an improper summary judgment motion on the issue of how damages were to be calculated); *Rice v. Kelly*, 483 So. 2d 559 (Fla. Dist. Ct. App. 4th Dist. 1986); *Krejci v. Halak*, 34 Ohio App. 3d 1, 516 N.E.2d 235 (8th Dist. Cuyahoga County 1986). The motion *in limine* should not be used to perform the function of a directed verdict. *Buck's Service Station, Inc. v. Department of Transp.*, 191 Ga. App. 341, 381 S.E.2d 516 (1989), *judgment aff'd*, 259 Ga. 825, 387 S.E.2d 877 (1990), or as a sweeping means of testing issues of law. *Schichtl v. Slack*, 293 Ark. 281, 737 S.W.2d 628 (1987).

Defendants rely on *Tomasello v. Rubin*, 920 F. Supp. 4 (D.D.C. 1996) for their proposition that a motion *in limine* can be used to eliminate Plaintiff's claims. However, *Tomasello* is no longer good law. The *Tomasello* court's dismissal of a plaintiff's claim for retaliation under the ADEA was overruled by the court in *Forman v. Small*, 271 F.3d 285 (C.A.D.C. 2001) (holding that the government's sovereign immunity was waived as to the plaintiff's retaliation claims).

In support of Defendants' thinly veiled effort to bring an untimely Motion for Summary Judgment in the guise of a Motion *in limine*, Defendants cite *United States ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 19 (D.D.C. 2008). Defendants' reliance on this case is misplaced. *U.S. ex rel El Amin* was a case where certified registered nurse anesthetists formerly employed by a hospital filed a *qui tam* action under the False Claims Act, alleging that hospital submitted false claims to Medicare for anesthesia services. The parties in that case

5

made pretrial evidentiary-related motions pertaining to the admissibility of evidence based on relevancy, materiality, the rules of habit evidence, discovery sanctions, exclusion of witnesses and various other evidentiary grounds.  *U.S. ex rel El Amin* certainly does not establish that a motion *in limine* should be used as a dispositive motion.

     **a.**     **Defendants' Motion *in limine* fails to meet the appropriate legal standard.**

Motions *in limine* are not the appropriate vehicle for resolving disputed factual issues. *Provident Life & Accident Ins. Co. v. Adie*, *supra*, (opining that if a party wanted to preclude opposing party from raising defenses at trial, then he should not have filed a motion *in limine* on the eve of trial, but should instead have filed a summary judgment motion pursuant to Federal Rule of Civil Procedure 56.  Summary judgment is only appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *See also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).  Clearly, a motion *in limine* may not properly be used as a vehicle to circumvent the requirements of rules of procedure. *Krejci v. Halak*, 34 Ohio App. 3d 1, 516 N.E.2d 235 (8th Dist. Cuyahoga County 1986).

Generally, courts require that motions *in limine* address specific evidence, rather than entire issues or claims.  An order *in limine* should only be used as a shield and never to gag the truth and permit other evidence to mislead the jury because the order prevents such evidence from being rebutted.  *Iowa Nat. Mut. Ins. Co. v. Worthy*, 447 So. 2d 998 (Fla. Dist. Ct. App. 5th Dist. 1984).  A motion *in limine* should not ordinarily be employed to choke off an entire claim or defense.  *Madison Associates v. Bass*, 158 Ill. App. 3d 526, 110 Ill. Dec. 513, 511 N.E.2d 690 (1st Dist. 1987); *People v. Musgrove*, 313 Ill. App. 3d 217, 246 Ill. Dec. 214, 729 N.E.2d 865

(3d Dist. 2000) (while motions *in limine* can be used to exclude collateral or extraneous matters, such motions should be used with caution so that they do not unduly restrict the opposing party's case or deprive a defendant of a legally viable defense); *Duffy v. Midlothian Country Club*, 135 Ill. App. 3d 429, 90 Ill. Dec. 237, 481 N.E.2d 1037 (1st Dist. 1985).  It is clearly improper for the court to allow a motion *in limine* which limits or refuses the introduction of relevant admissible evidence. *Mack v. First Sec. Bank of Chicago*, 158 Ill. App. 3d 497, 110 Ill. Dec. 537, 511 N.E.2d 714 (1st Dist. 1987).

While the ability to restrict the evidence presented at trial makes the *in limine* order a powerful weapon, such power also makes it a potentially dangerous one.  *Lockett v. Bi-State Transit Authority*, 94 Ill. 2d 66, 67 Ill. Dec. 830, 445 N.E.2d 310 (1983).  Before granting a motion *in limine*, the courts must be certain that such action will not unduly restrict the opposing party's presentation of its case.  *Burris v. Madison County*, 154 Ill. App. 3d 1064, 107 Ill. Dec. 898, 507 N.E.2d 1267 (5th Dist. 1987); *Whittley v. City of Meridian*, 530 So. 2d 1341 (Miss. 1988).  "Motions *in limine* address evidentiary questions and are inappropriate devices for resolving substantive issues." *See* 75 Am.Jur.2d *Trial* § 44 (2004) (explaining that motions *in limine* are improper vehicles to raise motions for summary judgment or motions to dismiss).

**b.  A trial court's ruling on a motion *in limine* is not a final ruling on the admissibility of the evidence in question.**

While a motion *in limine* typically is not final, Defendants seek a final dispositive action from the Court.  Defendants' Motion *in limine* to exclude all of Plaintiff's claims from trial in this matter seeks to preclude Plaintiff from presenting any of his claims to the jury because he "lacks sufficient evidence to prove any of his claims."  See Defendants' Motion at 2.  Plaintiff

7

also submits that by law, *in limine* relief can not not dispositive of Plaintiff's claims or evidence. *In limine* rulings are not binding on the trial court, and the trial court may always change its mind during course of trial. *Ohler v. U.S.*, 120 S. Ct. 1851, 146 L. Ed. 2d 826 (U.S. 2000). A trial court's ruling on a motion *in limine* is not a final ruling on the admissibility of the evidence in question, *State v. Sowers*, 763 So. 2d 394 (Fla. Dist. Ct. App. 1st Dist. 2000) (granting that a pretrial motion *in limine* is a **nonfinal** order); *Burks v. State*, 838 N.E.2d 510 (Ind. Ct. App. 2005), transfer denied, 855 N.E.2d 997 (Ind. 2006) (a favorable ruling on a motion in limine does not serve as the ultimate determination on the admissibility of certain evidence).

**B.    Plaintiff  can prove *Monell* liability against the District of Columbia.**

To maintain a §1983 action against the District of Columbia, Plaintiff must "demonstrate a deprivation of his constitutional rights that was caused by a policy, custom or practice of the District of Columbia, or a single 'municipal decision' [that] reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *McRae v. Olive*, 368 F.Supp.2d 91, 95 (D.D.C. 2005). Where plaintiffs can prove that violation of their constitutional rights was caused by acquiescence by policymaking municipal officials in previous unconstitutional conduct by city employees, the municipality may be held liable for the constitutional violation. *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987), *cert denied sub nom.* Moreover, "custom and usage," in the sense of "persistent and widespread ... practices" by municipal agents and employees, may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees. *Id.* quoting *Bennett v. Slidell*, 728 F.2d 762 at 769 (5th Cir. 1984). Actual knowledge may be evidenced by recorded reports to or discussions by a municipal governing body. Constructive

knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them. *Id.*  In other words, municipal liability may lie where a subordinate's misconduct is "so manifest as to imply the constructive acquiescence of senior policy-making officials."  *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992).

In *Baker v. District of Columbia*, 326 F.3d 1302, 1306-07 (D.C. Cir. 2003), the DC Circuit stated that Plaintiff can establish a municipal custom or policy by:

> the explicit setting of a policy by the government that violates the Constitution, the action of a policy maker within the government, the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom' or the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations.

A policy maker, for the purposes of municipal liability, is an official who has discretion to exercise particular functions assigned and to establish final governmental policy respecting activity.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-83; *See also Morgan v. Barry*, 785 F.Supp. 187, 194 (D.D.C. 1992)("the authority to make policy that will give rise to municipal liability is final policy…The District of Columbia can be held responsible under § 1983 for the eviction of the plaintiff if it was the product of a sanctioned policy ordered or allowed to exist by a municipal official with final policymaking authority in that area.")

<u>Plaintiff needs no expert to establish his claim for negligent training and supervision.</u>

In the District of Columbia, the Chief of Police and police supervisors are MPD's policymakers. The Chief of Police's policymaking authority is found in District of Columbia Municipal Regulations. Title 6A, § 800.3 provides:

> The Chief of Police shall promulgate all orders, rules and regulations of the Mayor or Council which pertain to the work of the Metropolitan Police Department, and shall issue those instructions consistent with the law or with the overall D.C. Government policy, as he or she may deem proper in the exercise of his or her functions as chief executive of the department.

In the case at bar, Plaintiff maintains that his injuries were caused by the District's deliberate indifference and acquiescence to custom and policy that routinely ignored the U.S. Supreme Court's ruling in *Florida. v. J.L., supra. Also see Byrd v. District of Columbia,* 297 F.Supp.2d 136, 139 (D.D.C. 2003) quoting *Baker v. District of Columbia*, 326 F.3d 1302, 1307 (D.C. Cir. 2003) (to demonstrate deliberate indifference, a plaintiff "must show more than simple of even heightened negligence; the District's indifference must be conscious, or at least reckless.")

To prove deliberate indifference, Plaintiff's facts establish that the need for more or better supervision to protect against constitutional violations was obvious. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). An obvious need may be established through proof of repeated complaints of civil rights violations. Deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to prevent further incidents. *Brooks v. District of Columbia,* 2006 WL 3361521 (D.D.C. 2006). Unlike the District's contention, the means of establishing deliberate indifference vary given the facts of the case and need not rely on any particular factual showing. The operative

inquiry is whether the facts suggest that the policymaker's inaction was the result of a "conscious choice" rather than mere negligence. *City of Canton, supra,* at 389.

In this particular case, it is indisputable that the United States Supreme Court has determined that "[a]n anonymous tip that a person is carrying a gun is not, without more, sufficient to justify a police officer's stop and frisk of that person." *Florida. v. J.L., supra*. Accordingly, such a stop clearly violates the Fourth Amendment to the United States constitution. In this connection, the District of Columbia police department has issued General Order No. 304.10 governing its policy and procedure on Police-Citizen Contacts, Stops and Frisks. See General Order, attached at Exhibit 2. The order states that its purpose is "to establish policies and procedures governing police-citizen 'contacts,' stops and frisks." This order was issued by former Chief of Police Maurice Turner Jr. on July 1, 1973. Indeed, this fact establishes Plaintiff's contention that the actions herein include the involvement of an established policy maker and that the policy maker (Chief of Police) has taken an unconstitutional action.

Upon information and belief, since Defendants have not provided documentation indicating otherwise, Plaintiff necessarily operates on the premise that this General Order governs contemporary police practices related to contacts, stops and frisks. Based upon these considerations, Plaintiff asserts that a viable police policy and practice is at issue. This departmental policy fails to reference or discuss the subject of uncorroborated anonymous tips in conjunction with stops and frisks. Hence, as a rule, absent explanation, the departmental policy invites potentially unconstitutionally action on the part of the police. Moreover, in its discovery responses, the District admits that its past and contemporary training of its officers is consistent with Police Order 304.10. See the District's Answers to Interrogatories, attached as Exhibit 3.

11

The District further admits that its training program fails to properly instruct officers as to the constitutional parameters outlined by the United States Supreme Court in *Florida v. J.L.* Hence, the District clearly omits any reference to anonymous caller restrictions in its training. Lastly, the District admits that the predicate call leading to the stop, frisk and automobile search of Plaintiff came from an unidentified caller. See Exhibit 3, Answer No. 5. Hence, by law, based on undisputed facts in this case, there is neither probable cause nor reasonable suspicion.

Thus, for purposes of analysis, Plaintiff are able to establish the following: 1) that the Chief of Police, a policy maker in the District of Columbia, issued the stop and frisk policy of the DC police department; 2) that the policy and practice related to stops and frisks omits any reference to anonymous tips despite the Supreme Court's 2000 decision in *J.L.*, holding that anonymous tips absent corroborating facts do not amount to reasonable suspicion for purpose of *Terry* stops; 3) the District's policy and practice, as ratified and sanctioned, by its ongoing recognition of and governance by its policy, admittedly governs its training and supervision of its police officers; and 4) the District's practices consistent with its constitutionally infirm policy are inherently widespread and pervasive since all officers have been trained and supervised consistent therewith.

Accordingly, Plaintiff is able to make a *prima facie* case of municipal liability and should be allowed to introduce pertinent evidence related to this claim. Further, given the prominence of the Supreme Court's decision on such a fundamental issue, Plaintiff should be able to show that MPD officials knew or should have known of a specific training need, that failure to address that need was likely to result in the violation of individuals' constitutional rights, and that MPD officials were deliberately indifferent to the need of such training. The constitutional rights at

12

issue here were clearly established when the U.S. Supreme Court decision *Florida v. J.L.* "put law enforcement officials on notice," and the "premise" of *Florida v. J.L.* "has clear applicability" to a subsequent set of facts. *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 2516-17, 153 L.Ed.2d 666 (2002).

Defendants suggest that Plaintiff requires an expert to establish liability here. Unlike the case relied upon by Defendants in footnote 3 of their argument, the case here is incomparable. First and foremost, the constitutional infirmity of the training program is indefensible. Secondly, Defendant has admitted that its training program is based upon a constitutionally defective policy and practice. Indeed, no expert is needed to prove a Section 1983 4th Amendment claim given the District's admissions and the clear mandate of United States Supreme Court in instances involving anonymous phone tips.

**C.      Sergeant Williams is not entitled to qualified immunity.**

Qualified immunity involves a three-step inquiry. First, the court should determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, the court should consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, the court should determine whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly establish constitutional rights." *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc) (citing *Dicerson v. McClellan*, 101 F. 3d 1151, 1158 (6th Cir.1996)); see also *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2007). The first two elements of qualified immunity are not at issue in this case.

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir.1992) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "Although it need not be the case that 'the very action in questions has been previously held unlawful, in the light of pre-existing law the unlawfulness must be apparent' " *Id* (quoting *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034). As the Supreme Court noted in *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 2516-17, 153 L.Ed.2d 666 (2002), an action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs.

Based upon the aforementioned analysis, the officers could not have had reasonable suspicion to stop, briefly detain and search Plaintiff. In fact, *Feathers v. Aey*, relied upon by Defendants recognizes as much. *Feathers v. Aey*, 319 F.3d 843, 848-850. In *Feathers*, as in the present case, an anonymous caller provided scant information that did not provide police the necessary reasonable suspicion required to perform a legitimate *Terry* stop. Contrary to Defendants' arguments, as a matter of law, the stop herein was not a legitimate *Terry* stop. Despite the ruling in *J.L*, and the similarity of the facts herein to that case, Defendants at page 10 of their motion urge this Court to ignore the record herein on this issue.

Interestingly, *Feathers* is even more factually significant in terms of uncorroborated factual indicia than *J.L.* Yet, Defendants insist that "the anonymous tip that provided the basis for the stop contained sufficient indicia of reliability to justify the stop". Defendant's Motion *in limine* at 10. Pray tell, that a barely dressed assertion from a anonymous source could cloak a communication with such heaviness that it would outweigh meaningful constitutional protections. This is hardly the intent of the law for as *Feathers* informs us, there is no reasonable

14

suspicion under these facts.  If the police acted unconstitutionally, as the Supreme Court clearly

ruled under these circumstances, then the stop itself was unconstitutional.   Feathers, however,

finds that in such situations police officers should nonetheless be entitled to qualified immunity

based upon the third prong of the qualified immunity argument.   The 6th Circuit's reasoning

appears circular except that the court found that given the "totality of the circumstances" the

officers in *Feathers* did not know that the tipster was anonymous and hence acted in a reasonable

manner.  *Id* at 850-851.  This is the factual predicate distinguishing *Feathers* from the present

case before this court.  *Id*. at 850-851.  In the present case, the defendant officers did know that

the tip was anonymous and the antithesis applies, to wit, the stop was unconstitutional because it

was unreasonable; there are no circumstances under these facts that justify the stop or mitigate

the officer's unconstitutional actions.   Thus, the officer's knowledge and actions based upon an

uncorroborated anonymous tip should be equally unconstitutional and otherwise consistent with

the court's finding in *J.L.*    Therefore, qualified immunity should not apply.

**D.      The Present Case is Controlled by the Supreme Court's Decision in *J.L.***

Given that this appears to be a case of first impression in this jurisdiction, Plaintiff asks

the court's indulgence to consider a detailed analysis as to why cases cited by Defendants at page

11 of the Motion i*n limine* are distinguished from *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375,

146 L.Ed.2d 254 (2000).  None of the cases cited by Defendants involve an uncorroborated

anonymous tip.  *US v Hicks,* 531 F.3d 555, 558-559 (7th Cir. 2008) is the primary case used by

Defendants, along with a number of other cases, distinguished below, that supposedly support its

position.  However, when examined closely, the case currently before the bar accords closely

with and is controlled by *J.L*, consistent with the protections afforded citizens through the Fourth Amendment.

Notably, the Supreme Court identified two problems with allowing anonymous tips to serve as the sole basis for a *Terry* stop, both of which are problematic in the present case. First, anonymous tips "alone seldom demonstrate the informant's basis of knowledge or veracity." *Id.* at 1378 (quoting *Alabama v. White,* 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)). Second, since anonymous tipsters cannot be held responsible for fabricated allegations, permitting such tips to result in a *Terry* stop would increase the potential for harassment through false accusation. *Id.*

The *Hicks* decision relied on by Defendants cited three reasons as to why *J.L.* was not controlling: (1) the tip in *Hicks* involved an "ongoing emergency" (as opposed to simply possessing a firearm as was the case in *Florida v JL*); (2) the tipster provided his name and identifying information in *Hicks*; and (3) the tip in *Florida v JL* lacked "predictive quality" that would allow police to confirm informant's credibility.  If we accept *Hicks* as establishing the analytical framework for cases justifying a *Terry* stop based on anonymous tips in a post-*J.L.* environment, then Defendants' argument must fail as there was no "ongoing emergency" in the instant case, nor did the tipster provide his or her name.

The court in *Hicks* began its argument noting that the Supreme Court's decision  in *J.L.* held that an anonymous and uncorroborated tip did not justify a *Terry* stop. *Id.* at 271, 120 S.Ct. 1375.  But *J.L.* did not hold that all anonymous or uncorroborated tips are unreliable; instead, it emphasized that the tip in question came from an ***unknown caller at an unknown location and provided no information that would allow the police to test the informant's credibility.*** *Id.*

16

(emphasis added). More importantly, and this is the first major distinction,  the *J.L.* Court did not treat the tip as one reporting an emergency. *Id.* at 268, 120 S.Ct. 1375.

Requirement for an "Ongoing Emergency"

The argument under *J.L.* failed in Hicks because the tip in Hicks reported a so-called "ongoing emergency."  "Every circuit to consider the question, including this one [but not the U.S. District Court for the District of Columbia], has distinguished *J.L.* when the tip is not one of general criminality, but of an ongoing emergency.  *Hicks* at 558,559. (emphasis added). *United States v. Brown,* 496 F.3d 1070, 1077 (10th Cir.2007); *United States v. Elston,* 479 F.3d 314, 319 (4th Cir.2007); *Drake,* 456 F.3d at 775; *United States v. Terry-Crespo,* 356 F.3d 1170, 1176 (9th Cir.2004); *Anthony v. City of New York,* 339 F.3d 129, 136-37 (2d Cir.2003); *United States v. Holloway,* 290 F.3d 1331, 1338-39 (11th Cir.2002), or very recent criminal activity, *Terry-Crespo,* 356 F.3d at 1176-77; *United States v. Valentine,* 232 F.3d 350, 354 (3d Cir.2000).

Thus an important threshhold question becomes what constitutes an "ongoing emergency."  *The Emergency Doctrine, Civil Search and Seizure, and the Fourth Amendment,* 43 Fordham L.Rev. 571, 582 (1975) ("Generally it is not difficult to determine when the emergency doctrine is being applied. The police usually are acting to help a person in distress, not to find evidence of criminal acts.")  Thus, in an emergency, the probable cause element may be satisfied where officers reasonably believe a person is in danger.  *See Koch v. Town of Brattleboro,* 287 F.3d 162 (2d Cir.2002) (stating probable cause for forced entry in response to

17

exigent circumstances requires probability a person is in danger).  In the case presently before the Court, and as can be inferred from the cases cited by Defendants, there was no one in danger and therefore no "ongoing emergency."

Cases cited by Defendants are distinguished from the case at bar because they involve actions that clearly constituted "ongoing emergencies," including a hostage taking, erratic driving while intoxicated and armed, and shots fired during a verbal altercation at a specific address.  In at least one of the cases cited, not only did the informant identify himself, but he called authorities twice, identifying himself each time.  In another case, the informant was known to police as a credible informant who did not call but reported the criminal activity in person.

For example, in *US v Brown*, 496 F.3d 1070, (10th Cir. 2007), the "ongoing emergency" was that of a detailed hostage situation reported by an identifiable informant.

> At approximately 9:53 a.m. on October 12, 2004, an unidentified male called 911 to report that a woman by the name of Shante was being held hostage by an armed man in apartment 22 at 424 Jefferson Street, Northeast. The caller stated that he had been visiting Shante when the man entered the apartment with a handgun in his back pocket. Shante and the man started arguing and Shante asked him to leave, but he refused. The caller stated that he believed the man was an ex-boyfriend Shante had tried to evict earlier in the day. The caller stated that Shante was afraid of the man and cowered against a wall when the man brandished his handgun. The caller tried to intervene, but the man told him to stay out of it. When the operator asked his name, the caller immediately replied "Tyrone," but shortly thereafter indicated he wished to remain anonymous.  *Brown* at 1070,1071.

> At the time the officers detained Mr. Brown, they knew the following facts: (1) a vehicle registered to a "Shante Stillman" was parked near the Zia Apartment

complex at 424 Jefferson Street, and the address on the registration was apartment 22, 424 Jefferson Street; (2) a friend of Shante had called 911, claiming that an armed man was holding Shante in apartment 22 and refusing to let her leave; (3) the friend had been present when the man entered the apartment and had seen the man's gun; (4) the caller believed the man might be an ex-boyfriend; (5) the 911 operator designated the call a priority one, meaning a direct threat to someone's life or property; (6) a telephone call placed to Shante's number was not answered; and (7) a man closely resembling the description provided by Shante's friend exited apartment 22. The court in Brown concluded that this knowledge was sufficient to give rise to a reasonable suspicion. *Id*.

By way of further example, in *US v Elston,* 479 F.3d 314 (4th Cir.2007), the "ongoing emergency" involved a highly intoxicated and armed driver, driving erratically, based on detailed information from an identifiable informant:

In the early morning hours of January 15, 2005, a Roanoke 911 operator received a report of a drunk driver from a woman identifying herself as Melba Taylor. Taylor asked the operator not to disclose her name to the police, because she was afraid that Elston, who was the subject of her call, would learn that she had reported him; the operator honored Taylor's request, and did not provide her name to the officers who responded to the 911 call. Taylor advised the operator that a highly intoxicated driver was leaving her home in Roanoke's Lansdowne housing project, "driving crazy" and headed towards either a nearby Family Dollar store or his own home in an area known as Wellmont Farms. J.A. 111. She reported that the driver's name was Jimmy, and that he had recently been released from a jail sentence imposed for assaulting the mother of his child. Taylor described the drunk driver as a black male wearing a light blue sweater, jeans, and white tennis shoes, and described his vehicle as a dark blue, 2003-model pickup truck with black-tinted windows, a large silver toolbox in back, and handicapped plates bearing license number 270464. She further advised that the driver had in his truck a loaded 9mm handgun, along with three clips of ammunition, and that he had threatened to "let [ ] them off in somebody." J.A. 109.

Given the existence of this "ongoing emergency", it is instructive to consider how the Elston court viewed *Florida v J.L, supra*, and the weight given to the so-called "firearm exception:"

> *J.L.* involved an anonymous tip "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." 529 U.S. at 268, 120 S.Ct. 1375. The Supreme Court ruled that this "bare-boned," anonymous tip, standing alone, was insufficient to justify a *Terry* stop. *Id.* at 273-74, 120 S.Ct. 1375. The Court also rejected Florida's assertion that the tip did not need to satisfy the usual standards of reliability merely because it alleged that its subject was carrying a firearm. *Id.* at 272-73, 120 S.Ct. 1375. In declining to adopt the so-called "firearm exception" that Florida advocated, however, the Court observed that a report of an emergency situation, such as a person carrying a bomb, might justify a *Terry* stop even if it did not satisfy the standards of reliability that would apply in less urgent circumstances. *Id.* at 273-74, 120 S.Ct. 1375.

> Our 2005 decision in [U.S. v. Brown, 401 F.3d 588 (4th Circ. 2005)] applied the principles of *J.L.* to an anonymous report that "a short, black male with glasses was carrying a firearm outside the Roseman Court apartment complex" in Newport News, Virginia. 401 F.3d at 590.    Police officers lacked reasonable suspicion to justify a *Terry* stop of defendant, under the Fourth Amendment, based upon anonymous telephone tip that alleged that a suspect matching defendant's general physical description was carrying a firearm outside an apartment building, ***absent officers' observation of any conduct by defendant that would cause them to suspect he was carrying a firearm, a history of reliable tips from the anonymous informant, or a basis for the informan''s knowledge.***  We concluded that so spare a tip, coming from an anonymous informant, lacked the indicia of reliability necessary to justify a *Terry* stop. *See id.* at 596. (emphasis added).

It is key to the matter presently before this court, then that just having or possessing a firearm is not sufficient.  More importantly, in *Elston* the Fourth Circuit affirmed its position in the earlier *US v Brown, supra,* decision that "absent officers' observation of any conduct by defendant that would cause them to suspect he was carrying a firearm, a history of reliable tips from the anonymous informant or a basis for the informant's knowledge," the officers lacked

reasonable suspicion to justify a *Terry* stop. In other words, the facts failed to satisfy the *Hicks*

analytical framework. That is precisely analogous to the facts currently before the court. The

defendant officers did not observe any conduct by Mr. Johnson that would cause them to suspect

he was brandishing a firearm; there is no history of reliable tips from the anonymous caller, nor

was a basis provided for the informant's knowledge, which turned out to be manifestly incorrect.

It is precisely this type of unchecked police power that the Fourth Amendment and the Supreme

Court's decision in *Florida v J.L.* seeks to prevent.

Defendants' third case, *U.S. v Terry-Crespo,* 356 F.3d 1170 (9th Cir. 2004), involved an

informant who not only identified himself, twice (in two different phone calls), but he was also

the victim of the emergency at hand. In other words, the facts completely satisfied the analytical

framework of *Hicks.* The *Terry-Crespo* court found that:

> " *Florida v. J.L.,* [cites omitted] does not compel suppression. First, as a
> threshold matter, the preliminary 911 call did not constitute an anonymous
> tip. The informant provided his name and narrowed the likely class of
> informants by providing identifying information during the recorded 911
> call. Second, the 911 call was entitled to greater reliability than a tip
> concerning general criminality because the police must be able to take
> seriously, and respond promptly to, emergency 911 calls. Third, the victim
> jeopardized any anonymity he might have enjoyed by placing his 911 call
> and risking criminal sanction under Oregon law for any false report. Finally,
> his 911 call was entitled to greater reliability because it evidenced first-hand
> information from a victim-informant. …

A police operator immediately dispatched officers to perform an "area check" in the

vicinity of Holgate and Milwaukee after receiving the initial call from the victim-informant,

Mr. Domingis. Shortly afterward, Mr. Domingis placed a second call to another 911 operator.

During this second call, Mr. Domingis again identified himself by name. *Id* at 1172.

In *US v Holloway,* 290 F.3d 1331 (11th Cir. 2002), officers received a dispatch to respond to gunshots.  While responding, a second dispatch was received indicating that gunshots continued.  Although the government cites this as a case of an "ongoing emergency", the issue actually turned on the doctrine of "exigent circumstance"[1]

At 10:22 p.m. on August 4, 1999, Officer Norman Bernard of the Alexander City Police Department received a dispatch from a 911 operator to investigate a report of gunshots and arguing emanating from 3785 Washington Street. Officer Bernard proceeded immediately to the location of the disturbance. En route, the officer received a second dispatch from the 911 operator indicating the caller was reporting continued gunshots and arguing. Officer Bernard arrived at the designated address at approximately 10:29 p.m., within a minute of the second dispatch from the emergency operator. Providing back-up in a separate patrol car was Officer Marcus Billips, who also responded to the emergency dispatch.

*US v Valentine,* 232 F.3d 350 (3d Cir. 2000) turned on the highly credible nature of the informant in that a face-to-face tip has more credibility than a phone call:

We begin our analysis with the Supreme Court's recent opinion, *J.L.*, the case that prompted the District Court to reconsider its initial denial of Valentine's suppression motion. In *J.L.* the Supreme Court held that police officers lacked reasonable suspicion to make a *Terry* stop when an anonymous caller reported that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Florida v. J.L.*, 529 U.S. at ----, 120 S.Ct. at 1377. …Finding the tip unreliable, the Court did not consider under what circumstances a reliable tip that someone was carrying a gun would provide the police with reasonable suspicion. Instead, the Court concluded, "All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any

---

[1]     *Holloway* involves a warrantless entry of a person's home, rather than a police stop based on an anonymous tip.  Unlike the instant case, *Holloway* revolves around the doctrine of "exigent circumstances."  The exigent circumstances exception recognizes a "warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant." *Michigan*, 436 U.S. at 509, 98 S.Ct. at 1949. This exception encompasses several common situations where resort to a magistrate for a search warrant is not feasible or advisable, including: danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit.  *Holloway* at 1334.

basis for believing he had inside information about J.L." 529 U.S. at ----, 120 S.Ct. at 1379.  *Valentine* at 353, 354.

Discussing the reliability of anonymous tips, the Court explained, "Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, *see Adams v. Williams*, 407 U.S. 143, 146-147, 92 S.Ct. 1921, 1923-24, 32 L.Ed.2d 612 (1972), 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.' " *J.L.,* 529 U.S. at ----, 120 S.Ct. at 1378 ( *quoting Alabama v. White,* 496 U.S. at 329, 110 S.Ct. at 2415). Nevertheless, even in the context of probable cause, the Court has rejected its earlier, inflexible two-prong test for tips set forth in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Under *Aguilar* and *Spinelli*, the government could not rely on a tip unless the government could demonstrate both the basis of the informant's knowledge and the informant's reliability or veracity. The Court now uses a flexible standard that assesses the relative value and reliability of an informant's tip in light of the totality of the circumstances. *See, e.g., Illinois v. Gates*, 462 U.S. 213, 230-35, 103 S.Ct. 2317, 2328-30, 76 L.Ed.2d 527 (1983); *Alabama v. White,* 496 U.S. at 329, 110 S.Ct. at 2415.

The informant's tip in our case is different from the telephone call in *J.L.* First, unlike *J.L.*, the officers in our case knew that the informant was reporting what he had observed moments ago, not what he learned from stale or second-hand sources. At the suppression hearing, Officer Woodard was asked, "Did [the informant] say how long ago that he saw the individual carrying a gun?" Woodard replied, "About-maybe a second ago, two seconds ago." App. at 68. So the officers could expect that the informant had a reasonable basis for his beliefs. The Supreme Court has recognized the greater weight carried by a witness's recent report, such as when "the victim of a street crime seeks immediate police aid and gives a description of the assailant." *Adams v. Williams,* 407 U.S. at 147, 92 S.Ct. at 1924.

Second, the officers had more reason to believe that the informant was credible than the officers did in *J.L.*, for a tip given face to face is more reliable than an anonymous telephone call. As the Fourth Circuit recently explained, when an informant relates information to the police face to face, the officer has an opportunity to assess the informant's credibility and demeanor. *United States v. Christmas,* 222 F.3d 141, 144 (4th Cir.2000). And when an informant gives the police information about a neighbor (as in *Christmas*) or someone nearby (as in our case), the informant is exposed to a risk of retaliation from the person

named, making it less likely that the informant will lie. *Id.* Similarly, as the Fourth Circuit noted, "citizens who personally report crimes to the police thereby make themselves accountable for lodging false complaints." *Id.* ( *citing Illinois v. Gates*, 462 U.S. at 233-34, 103 S.Ct. at 2329-30 (1983); *Adams v. Williams*, 407 U.S. at 146-47, 92 S.Ct. at 1923).

Finally, in *Hicks* the informant, Woodbury, gave his name, his location, and described his clothing; that is, he was not anonymous.  The Second Circuit summarized these holdings to mean that reasonable suspicion may be based on a telephone tip when the caller provides enough information to allow police to "identify her and track her down later to hold her accountable if her tip proved false." *Elmore,* 482 F.3d at 182. This rule finds support in *J.L.* where the Supreme Court noted the reliability of a known tipster "whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated." *J.L.,* 529 U.S. at 270, 120 S.Ct. 1375.

Thus Plaintiff argues that on these facts, *J.L.* is the controlling authority.  If *Hicks* is to provide the analytical framework as suggested by Defendants, then absent an "ongoing emergency" and absent an identified or identifiable informant who can be held responsible if the allegations turn out to be fabricated, Defendants' arguments must fail.[2]

**E.    Plaintiff does not need an expert to establish his claim for physical harm suffered**

Plaintiff has provided supplemental discovery records to Defendantnat related to his medical condition and further, kept the District advised of complications relating thereto.

---

[2]    Plaintiff omitted analysis of Anthony v City of New York, 339 F.3d 129 (2 Cir. 2003) because it too involved the question of exigent circumstances as justification for the warrantless invasion of a personal residence based upon a 911 call originating from the Plaintiff-victim's apartment. Plaintiff was an adult woman who suffered from Down Syndrome and found alone in the apartment, with no caretaker.  Police transported her to Kings County Hospital where she was medicated and held overnight for observation.

Further, the District was well aware of the Plaintiff's medical condition and treatment. Furthermore, the district is well aware that plaintiff was treated by medical doctors when he was hospitalized and that said doctors need not be offered as experts to testify as to plaintiff's injury and causation. In the District of Columbia , a treating physician's opinion is preferred over that of a medical **expert** retained for purposes of litigation. *Hisler v. District of Columbia Dep't of Employment Servs.,* 950 A.2d 738, 746 n. 9 (D.C.2008).   Hence, Plaintiff can establish an injury and causation through Plaintiff's treating physicians.

## CONCLUSION

Based upon the above stated reasons, this Court should also allow Plaintiff's false arrest and assault claims to go to the jury.  The case before the court clearly shows a constitutional violation and the vulnerability of a police system that ignores the mandates of the highest court in these United States and our constitution.   In its wisdom, our court recognized that were the law as Defendants suggest, hundreds, if not thousands, or even hundreds of thousands of unknown persons could venomously, or even playfully, manipulate the system  and abuse the rights of harmless and innocent civilians such as Mr. Johnson.   The only check and balance on such a system may be an American citizen's untempered right to command public accountability through litigation of this nature, and thus the preservation of our scared constitution.   For these reasons, Defendants' motion should be denied.

Respectfully submitted,

Donald M. Temple
Donald M. Temple #408749
1229 15th Street, NW
Washington, DC 20005
Tel: (202) 628-1101

25

Fax: (202) 628-1149
Attorney for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Plaintiff's Memorandum in Opposition to Defendants' Motion in Limine was sent electronically on this 8th day of September, 2008 to the following:

Vanessa E. Atterbeary
Assistant Attorney General
441 Fourth Street NW Suite 6S 070
Washington, DC 20001

Donald M. Temple
Donald M. Temple