**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **GEORGE JOHNSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | C.A. No. 06-1453 (RCL) |
| v. | ) | |
| | ) | |
| **SERGEANT BREDET WILLIAMS,** *et al.* | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION IN LIMINE**

Plaintiff's Opposition attempts to assert facts and argument where none exist. Essentially, Plaintiff seeks to have his case presented to the jury despite the fact that Plaintiff has not discovered any facts that are legally sufficient to support his claim. For the reasons detailed below, Defendants' Motion *In Limine* should be granted.

**I.      Defendants' Motion Is Properly Before the Court**

Plaintiff asserts that a motion in limine is an improper means by which the Court may dismiss claims prior to trial. Opp. at 4-8. Plaintiff overlooks the fact that the Federal Rules of Civil Procedure expressly permit a Court to dismiss frivolous claims at the pretrial stage. Fed. R. Civ. P. 16(c)(2)(A). Claims that are not supported by any evidence are frivolous.

Plaintiff has failed to cite *any* controlling authority for his proposition that Defendant's motion *in limine* was untimely, improper, failed to meet the appropriate legal standard and would not be a final ruling on any causes of action properly excluded. Instead, Plaintiff has relied on a series of cases which are distinguishable on its facts. Further, it is

within the trial court's discretion to entertain a motion *in limine* to facilitate case management as contemplated by Fed. R. Civ. P. 16(c)(1).

### A. Plaintiff incorrectly states the court's holdings in *Tomasello* and *United States ex rel. El-Amin.*

Plaintiff incorrectly states that *Tomasello* is no longer good law. *Tomasello v. Rubin*, 920 F. Supp. 4 (D.D.C. 1996). *Tomasello* was overruled by the court in *Forman* on a different narrow point of law. *Forman v. Small*, 271 F. 3d 285 (C.A.D.C. 2001). Specifically, *Forman* overruled the holding in *Tomasello* that the government had sovereign immunity regarding retaliatory claims under the Age Discrimination in Employment Act (ADEA). *Id* at 298.[1] *Forman* did not overrule the principle set forth in *Tomasello* that a court can grant a motion *in limine* dismissing certain claims and limiting the evidence presented to the jury. *Tomasello*, 920 F. Supp. at 4.

Similarly, Plaintiff's assertion that Defendants' incorrectly rely on *United States ex rel. El-Amin* is also wrong. *See* Plaintiff's Opposition Motion at 5. *United States ex rel. El-Amin* stands for the proposition that "A key purpose of a motion *in* limine is to resolve specific evidentiary issues in advance of trial." United *States ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 19 (D.D.C. 2008). Plaintiff must provide this court with an "essential link between their arguments and the evidence in the record that would support their arguments." *Id.* Here, Plaintiff has wholly failed to link his civil rights claim to any evidence demonstrating a custom or practice. *Monell v. Department of Soc. Servs,* 436 U.S. 658, 691 (1978). Plaintiff has also wholly failed to link any evidence (an official policymaker) to a *de facto* District policy as required in *Pembaur*. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986). The court should not delay the resolution of the

---

[1] *Foreman* held that the government was subject to retaliation claims under the ADEA. *Id.*

important evidentiary issues raised in Defendants' motion *in limine* until trial on the slim hope that Plaintiff will, at some point, gather the evidentiary support necessary to make his case. *United States ex rel. El-Amin* at 20.

### B. Plaintiff relies on a series of cases that do not have controlling authority and/or which are distinguishable from the instant matter.

Next, Plaintiff cites *Provident Life Insurance* for the proposition that "motions *in limine* are not the appropriate vehicle for resolving disputed factual issues." *Provident Life & Accident Ins. Co. v. Adie,* 176 F.R.D. 246 (D.Mich.1997). Opp. at 6. Plaintiff misses the mark, in that, Defendants do not seek to resolve factual issues but rather to exclude causes of action that are not properly before this court. Plaintiff relies on an Ohio Court of Appeals opinion in which the court held that where the trial court solely relied on defense counsel's characterization of the facts of the case a motion *in limine* was improper. *Krejci v. Halak,* 34 Ohio App. 3d 1, 4 (8th Dist. Cuyahoga County 1986). Here, the court will have the benefit of having heard a characterization of facts from both Plaintiff and Defendant and; therefore, a motion *in limine* is proper.

Similarly, Plaintiff's reliance on *Iowa Nat. Mut. Ins. Co.*, is misplaced. In *Iowa Nat. Mut. Ins. Co.*, the District Court of Appeal of Florida dealt with a motion *in limine* granted by the trial court that led to erroneous evidence being presented to the jury. *Iowa Nat. Mut. Ins. Co. v. Worthy*, 447 So. 2d 998, 1000 (Fla. Dist. Ct. App. 5th Dist. 1984). The court held that the motion *in limine* could not be used to provide erroneous information to the jury. *Id.* This case is distinguishable as Defendants seek to exclude claims that are legally deficient and improperly before this court.

Plaintiff incorrectly states the holding in *Madison Associates*, as it relates to motions *in limine*. The Appellate Court of Illinois recognized that "The granting of a motion *in*

3

*limine* is a matter within the trial court's discretion." *Madison Associates v. Bass*, 158 Ill. App. 3d 526, 540, 541 (1st Dist. 1987). Similarly, this court can exercise its own discretion in entertaining and granting a motion *in limine*. The *Madison* court excluded a defense which it found to be invalid via the plaintiff's motion *in limine*. *Id.*[2] The converse is also true, this court has the discretion to exclude Plaintiff's claims that it finds to be invalid.

Plaintiff also cites a series of cases for the proposition that motions *in limine* should be used with caution. *See* Plaintiff's Opposition Motion at 7, citing *Lockett v. Bi-State Transit Authority*, 94 Ill. 2d 66 (1983); *Burris v. Madison County,* 154 Ill. App. 3d 1064 (5th Dist. 1987)[3] and *Whittley v. City of Meridian*, 530 So. 2d 1341 (Miss. 1988).[4] Notably, Plaintiff has cited cases which do not have controlling authority in this court. Furthermore, contrary to Plaintiff's assertions, because courts may exercise discretion in entertaining motions *in limine,* other jurisdictions have used it to dispose of frivolous claims.[5]

### C. Courts can treat a motion *in limine* as a dispositive motion.

While this issue is not resolved in the D.C. Circuit, the 6th Circuit has held that motions *in limine* can be treated as dispositive motions. *Amtower v. Photon Dynamics, Inc.*, 158 Cal. App. 4th 1582 (Cal. App. 2008), *rev. denied.* In *Amtower*, the trial court granted defendant's motion *in limine* and excluded all evidence pertaining to §11 of the Securities Act of 1933 on the ground that the claim was barred by the statute of limitations. *Id.* The court recognized that

---

[2] Similarly, Plaintiff misguidedly relies on the earlier case of *Duffy v. Midlothian Country Club,* 135 Ill. App. 3d 429, 436 (1st Dist. 1985) in which the court finds that a motion *in limine* should not preclude the defendant from presenting a valid defense. Plaintiff also relies on the criminal matter of People *v. Musgrove*, 313 Ill. App. 3d 217 (3d Dist. 2000) which also deals with a motion *in limine* used to exclude a defense. *Id.* at 218.
[3] The court in *Burris* also held that a motion *in limine* can be a useful tool. *Burris*, 154 Ill. App. 3d at 1070.
[4] *Whittley* dealt with the exclusion of a letter which put the defendant on notice of the danger of the refuse bins which injured the plaintiff. *Whittley*, 530 So. 2d at 1343. The trial court had excluded the letter based on defendant's motion *in* limine and refused to let plaintiff use the letter when defendant denied he knew of the danger refuse bins may cause. *Id.* The instant matter does not involve a question of impeachment.
[5] Plaintiff mistakenly believes that the issue at hand is the admission of relevant evidence and cites *Mack v. First Sec. Bank of Chicago*, 158 Ill. App. 3d 497 (1st Dist. 1987). In fact, the issue is that there is no relevant evidence to support Plaintiff's claims.

"strictly speaking" the motion was not an *in limine* motion. *Id.* at 1593. The court noted that "it has become increasingly common, however, for litigants to utilize *in limine* motions . . ." to replace dispositive motions. *Id.* The latter results in the court dismissing a cause of action on the pleadings. *Id.* The court further held that despite any drawbacks that may arise from the use of a motion *in limine* as a dispositive motion, trial courts have the inherent authority to use them in this way. *Id.* at 1595.

Here, the record reveals that Plaintiff could not prevail under any circumstances. The fact that he was not afforded detailed procedural protections from a summary judgment motion is moot. *Id.* Based on the foregoing, Plaintiff has not demonstrated that he will be successful on his civil rights claim, that Defendant Sergeant Williams is not entitled to qualified immunity, that his claim of false arrest should proceed, that the officer's actions were not privileged and that he can sustain a claim of negligent training and supervision. As a result, Defendants' Motion *In Limine* is proper and should be granted.[6]

## II.     Plaintiff Lacks Evidence to Prove an Unconstitutional Custom or Policy

Plaintiff asserts that he is able to prove his *Monell* claim against the District with evidence of both an unconstitutional policy and the deliberate indifference on the part of the District to an obvious need to train. Opp. at 8-13. First, Plaintiff asserts that the ultimate policymaker of the Metropolitan Police Department, the Chief of Police, issued General Order 304.10 on July 1, 1973,[7] and that this general order "fails to reference or discuss the subject of uncorroborated anonymous tips in conjunction with stops and frisks." Opp. at 11. Plaintiff further states that because the District's training is conducted in conformity with General Order

---

[6] Based upon Defendants' arguments *infra*, the cases cited by Plaintiff with respect to motions *in limine* not being final orders are inapplicable. *See* Plaintiff's Opp. To Motion *In Limine* at 8.
[7] The General Order was revised on September 24, 1985.

304.10, the District's training vis-à-vis stops and frisks is pursuant to an unconstitutional policy. *Id.* at 11-12.

In essence, Plaintiff appears to claim that because the case of *Florida v. J.L.*, 529 U.S. 266 (2000) is not cited by name, the General Order is constitutionally defective. From that precarious premise, Plaintiff leaps to his second theory that because MPD purportedly uses this General Order as just one part of its training, the District and MPD officials are deliberately indifferent to an obvious need to train. Defendants will address each of Plaintiff's theories in turn.

First, Plaintiff's claim that General Order 304.10 sets forth an unconstitutional policy is without merit. General Order 304.10 sets forth the well-settled law that if a police officer "<u>reasonably suspects</u> that a person has committed, is committing, or is about to commit any crime, the officer has the authority to stop and detain that person for the purpose of determining whether or not probable cause exists to arrest." General Order 304.10 § I.B.1 (emphasis in original). The General Order further states that a police officer may conduct a frisk where the officer "<u>reasonably suspects</u> that the person [stopped] is carrying a concealed weapon or dangerous instrument and that a frisk is necessary to protect himself/herself or others." General Order 304.10 § I.C.1 (emphasis in original).

This quoted language paraphrases the seminal case of *Terry v. Ohio*, which, not uncoincidentally, was starting point for the Supreme Court's decision in *Florida v. J.L.*:

> Where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully

6

>limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*J.L.*, 529 U.S. at 269-70 (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).  Thus, *J.L.* does not overrule or even modify the basic rule established by the Supreme Court and set forth in General Order 304.10 that stops and frisks must be based upon reasonable suspicion.  Rather, *J.L.* reflects one of many rulings issued by the Supreme Court to attempt to define the parameters of reasonable suspicion in certain contexts.

Indeed, the parameters of reasonable suspicion and the inability to define a bright-line test are reflected by General Order 304.10.  The Order expressly notes that "'reasonable suspicion' is not capable of precise definition."  General Order 304.10 § I.B.2.  General Order 304.10 goes on to state that reasonable suspicion "is more than a hunch or mere speculation on the part of the officer but less than the probable cause necessary to arrest," and teaches that it is "a combination of specific facts and circumstances which would justify a reasonable officer to believe that the person stopped has committed, was committing, or was about to commit a criminal act."  *Id.*

The Order goes on to state a number of factors to be considered by an officer in determining whether reasonable suspicion to make a stop exists, including the appearance of the individual, the actions of the individual, the individual's demeanor during his or her contact with the officer, the area of the stop, the time of day, and the officer's training and experience.  *Id.*  Importantly, the Order also permits an officer to base reasonable suspicion "upon information supplied by civilian witnesses or police informants who he/she deems to be reliable, either by virtue of their character or by information provided that has been corroborated by the officer;" and information obtained from law enforcement sources, including lookouts such as the one that was supplied in this case.  General Order 304.10 § I.B.2.

7

The provisions of this General Order are entirely consistent with *J.L.* Like General Order 304.10, the Court's decision in *J.L.* states that "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" *J.L.*, 529 U.S. at 270 (quoting *Alabama v. White,* 496 U.S. 325, 327 (1990)). Thus, *J.L.*, like General Order 304.10, does not outright prohibit the reliance on an anonymous tip in determining whether reasonable suspicion to conduct a stop or frisk exists. Plaintiff is incorrect in positing otherwise. Opp. at 12. That General Order 304.10 does not cite *J.L., Terry,* or any other Supreme Court case analyzing the parameters of "reasonable suspicion" by name is of no moment: the policies and procedures set forth by the General Order reflect the actual holdings of relevant Supreme Court decisions and are not inconsistent with well-settled law. Accordingly, as a matter of law, General Order 304.10 does not represent an unconstitutional policy or procedure of the District of Columbia.

Moreover, the fact that the Metropolitan Police Department relies on General Order 304.10, in part, to train its officers cannot satisfy the *Monell* standard by which Plaintiff must prove that the District was deliberately indifferent to a serious need to train, and that such deliberate indifference actually caused the Plaintiff's injury. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985). As stated, to the extent that the District relied upon General Order 304.10 to train its officers, that Order generally reflects well-settled law and is not deficient. Additionally, Plaintiff did not seek a deponent of the District pursuant to Fed. R. Civ. P. 30(b)(6) to probe the extent of the District's specific training with regard to stops and frisks. Plaintiff has no evidence to demonstrate that the District's training program regarding stops and frisks was lacking in any manner.

Plaintiff also has not named an expert to describe to the jury any alleged deficiencies with regard to the District's training of its officers. Instead, Plaintiff insists that "the constitutional infirmity of the training program is indefensible," that the training program is "based upon a constitutionally defective policy and practice," and that no expert is needed in light of the "clear mandate of [the] United States Supreme Court in instances involving anonymous phone tips." Opp. at 13. Plaintiff has not indicated how a jury of laypersons can determine whether the training offered by the District did not satisfy constitutional standards without the assistance of an expert to explain the parameters of constitutionality in the area of police stops and frisks, and how the District's training omits or misinterprets the law in that regard. *See* Mem. in Supp. of Mot. in Limine at 18-19.

Finally, Plaintiff cannot maintain – as required – that any alleged failure of a need to train regarding anonymous tips actually caused Plaintiff's injury. The Supreme Court has expressly held that, "at the very least there must be an affirmative link between the policy and the particular constitutional violation alleged." *City of Oklahoma*, 471 U.S. at 824. Here, the officers did not have knowledge that the tip was anonymous until after the stop and frisk of Plaintiff, and therefore any alleged lack of training on this issue is irrelevant as it lacks the requisite causal connection.[8] Thus, Plaintiff cannot base his *Monell* claim on a deliberate indifference to an obvious need to train.

---

[8] Plaintiff insists that the officers knew because they told him at the scene that the tip was anonymous. Opp. at 2. Defendants do not dispute that the Plaintiff was told at the scene that the tip was anonymous; however, it is clear from the recordings of the Fourth District dispatch (provided to the Court and to Plaintiff during discovery) that when the lookout for the suspect – driving a vehicle that was the same make, model, and color of Plaintiff's vehicle, with virtually the same license plate, driving in the same vicinity of Plaintiff – there was no indication that the information came from an anonymous tip. After Plaintiff was stopped and frisked and began to make inquiries of the officers, Sergeant Williams can be heard on the transmissions asking from where the tip originated and requesting that a scout car be sent to the place of origin to determine if anyone there was hurt or had additional information. Plaintiff therefore cannot seriously dispute that the officers had no knowledge that the tip was anonymous. That Plaintiff "carefully pled" (Opp. at 2) that the officers knew the tip was anonymous is of no

### III.  Sergeant Williams Is Entitled to Qualified Immunity

Plaintiff asserts that Sergeant Williams is not entitled to qualified immunity. As Plaintiff notes, qualified immunity requires a three-step inquiry to determine: (1) whether a constitutional right guaranteed Plaintiff was violated; (2) if so, whether the right was clearly established at the time; and (3) whether Sergeant Williams' actions in that regard were objectively unreasonable. *Saucier v. Katz,* 533 U.S. 194 (2001); *Lederman v. United States,* 291 F.3d 36 (D.C. Cir. 2002).

Here, Plaintiff contends that his Fourth Amendment rights were violated because the police stopped and frisked him based upon an anonymous tip. As the Supreme Court stated in *J.L.,* an anonymous tip can form the basis for reasonable suspicion in certain circumstances. Defendants submit that such circumstances are present here.

First, unlike the tip in *J.L.*, the tip given was detailed in nature. The tip provided the car's make (Ford), model (Explorer), color (green), direction of travel (northbound on 13th Street passing Decatur), and license plate number (658M037). Whereas the tip in *J.L.* (young black male wearing a plaid shirt at a bus stop) could apply to an unknown number of individuals in the area, the tip in question clearly applied to only one particular vehicle with a particular tag number. Because only one vehicle has this tag number, the particular tag is uniquely associated with just one car. Indeed, the information given by the informant of make, model, color and tag number, is the functional equivalent of identifying a particular subject by name and providing a physical description.[9] Thus, the fact that the tip reported one specific vehicle lends credibility to the report.

---

moment at this juncture in the proceedings – the evidence produced in discovery demonstrates that the officers did not have this knowledge until after the fact, and there is no evidence (beyond Plaintiff's Complaint) to the contrary.
[9] That the tag number belonging to Plaintiff's vehicle is slightly different from that given by the informant – 568M037, as compared to the reported 658M037, does not effect the inquiry of whether the report contained

10

Second, unlike in *J.L.*, it is clear from the 911 call that the tipster was witnessing a crime in progress when identifying the vehicle. *Cf. J.L.*, 529 U.S. at 271 (informant "neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L."). In the recording of the 911 call in this case, it can easily be inferred that the tipster was reading the license plate from the moving vehicle as he was traveling near the vehicle before the informant turned off the street. Thus, there can be no question that the caller was identifying actual criminal activity as he witnessed it.

Third, unlike in *J.L.*, the caller was reporting a crime in progress – a man waiving a gun out of a the window of a moving vehicle. In *J.L.*, the firearm was concealed and the caller did not indicate that J.L. was actively involved in a crime with the gun. In this case, it is illegal in the District of Columbia for most individuals to possess a firearm outside of the home, and it certainly is illegal for any individual to waive a gun from a moving vehicle. Thus, it appears that the caller was reporting a potential, ongoing assault with a deadly weapon during the 911 call.

Fourth, unlike in *J.L.*, an emergency situation existed in that the suspect was actually brandishing a weapon and thereby arguably assaulting individuals on the street as he drove past. As the court in *United States v. Terry-Crespo*, 356 F.3d 1170 (9th Cir. 2004), observed, a 911 call is "entitled to greater reliability than a tip concerning general criminality because the police must take 911 emergency calls seriously and respond with dispatch." *Terry-Crespo,* 356 F.3d at 1176. The Court thus held, "[t]he Fourth Amendment does not require the police to conduct further pre-response verification of a 911 caller's identity where the caller reports an emergency. Accordingly, an emergency 911 call is entitled to greater reliability than an anonymous tip concerning general criminality." *Id.*

---

sufficient indicia of reliability to create reasonable suspicion; rather, the question of whether it was appropriate for the officers to stop a vehicle with a slightly different inquiry is better assessed in the analyzing the question of the officers' objective reasonableness.

11

Plaintiff tries to downplay the report in this case by referring to it as a complaint of possession of a gun and asserts that the caller does not report an emergency. Opp. at 20. The 911 call, however, reports a potentially ongoing assault with a deadly weapon in that the caller stated that the suspect was waiving a pistol. Plaintiff's position that this particular crime does not compare with other cases addressing "hostage taking, erratic driving while intoxicated and armed, and shots fired during a verbal altercation at a specific address," simply does not make sense. Opp. at 18. Plaintiff cannot possibly suggest that officers, armed with detailed information regarding criminal conduct, must put off an investigation in order to wait for a citizen to be seriously injured by the suspect and his gun. Moreover, Plaintiff cannot possibly contend that waiving a gun is a harmless act in light of the fact that the damages he himself asserts in this case are solely based on his claim that police officers pointed their guns at him. *See also Terry-Crespo,* 356 F.3d at 1176 ("[In *J.L.*], the alleged crime concerned general criminality, simple possession of a firearm by a minor, not a contemporaneous emergency event, such as Terry-Crespo's brandishing of a firearm in a high-crime area.").[10]

Fifth, unlike in *J.L.,* where the suspect was simply standing at a bus stop, the caller's report had elements of predictability in that the suspect vehicle was spotted, still traveling northbound on 13th Street, a little over a mile from where the suspect was reported to have been within approximately two minutes of the call to 911. *Cf. J.L.*, 529 U.S. at 271 ("The anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility.").

---

[10] *See also United States v. Drake,* 456 F.3d 771, 775 (7th Cir, 2006) ("It is enough in this case that Williams's 911 call reported an immediate threat to public safety and that she provided sufficient details to allow the officers to identify the suspects. The police, when they located the Cadillac Williams described, were not confronted with any reason to doubt her report, and thus the presumption remained intact. Requiring further indicia of reliability would only jeopardize the usefulness of the 911 system and the ability of officers to prevent further danger to the public.").

Finally, unlike in *J.L.,* the police here were responding to a 911 call, and all records of the 911 call and subsequent dispatch have been provided to the Court and Plaintiff. The court in *Terry-Crespo* observed that the Supreme Court in *J.L.* expressed concern regarding "the complete absence of any evidence of the call" and noted that "[a]bsent evidence of the original call, the specter of after-the-fact, police fabrication of an 'anonymous informant' would challenge any Fourth Amendment analysis." *Terry-Crespo*, 356 F.3d at 1175. The court further noted that in the case before it (as here), the court had received the 911 recording and a transcription, thus, the court did "not believe that the same concerns that may have animated the Court to treat *J.L.* as an unreliable, anonymous tip apply here." *Id.*

In light of the foregoing, Defendants submit that there was no violation of Plaintiff's Fourth Amendment rights. The tip – albeit an anonymous tip – contained sufficient indicia of reliability to create reasonable suspicion for the officers to stop Plaintiff's vehicle and conduct a pat down of Plaintiff and his passenger. However, even if the tip could not support reasonable suspicion, and assuming that Plaintiff's rights in that regard were clearly established, *see Feathers v. Aey,* 319 F.3d 843, 850 (6th Cir. 2003), Plaintiff has offered no evidence to show that Sergeant Williams' actions were objectively unreasonable.

Instead, Plaintiff appears to bootstrap on his argument that, simply because the stop was not supported by reasonable suspicion, it was objectively unreasonable. Opp. at 14. In support, Plaintiff cites what he describes as the "factually significant" *Feathers* case. Opp. at 14. Plaintiff omits the fact that the *Feathers* Court found that the officers there were entitled to qualified immunity for their actions. Specifically, the court in *Feathers* held:

> Based on the information that [the officers] had themselves, the *Terry* stop was reasonable. The dispatcher informed the officers of a suspicious person who was possibly intoxicated and supposed to be carrying a weapon. Although this information was from an anonymous tipster, whose information was not sufficient

13

> to create reasonable suspicion under *J.L.*, the officers knew only what had been reported from the dispatch, and efficient law enforcement requires – at least for the purposes of determining civil liability of individual officers – that police be permitted to rely on information provided by the dispatcher. If the dispatcher's information were accurate and reliable, as the police presumed, the totality of the circumstances would justify the *Terry* stop.

*Feathers,* 319 F.3d at 851. Here, it is clear from the actual evidence submitted to the Plaintiff and the Court that Sergeant Williams did not know the origin of the 911 call until after she stopped and frisked Plaintiff. Indeed, as can be heard in the dispatch recordings, Sergeant Williams made efforts to try to determine from where the call was made after the fact, and requested that a unit be dispatched to determine whether anyone had been injured in the area from where the call originated.

Here, Sergeant Williams stopped a vehicle that she had reason to believe was driven by an individual that had been waiving a gun around. The vehicle was still traveling in the same direction, approximately a mile from where it was reported, and matched the physical description provided by the caller. That the first two numbers of the tag were transposed does not preclude a finding that the stop was objectively reasonable as the tag number was virtually the same as that reported and all other attributes – make, model, color, direction – were exactly the same.

It should also be noted that police officers are required to respond to dispatch calls, and to fail to do so would result in a dereliction of duty. General Order 201.26. Moreover, as noted in Defendants' opening brief, a requirement that officers investigate complainants prior to investigating the actual complaints would render law enforcement overburdened and ineffective. Indeed, as the Seventh Circuit noted in *United States v. Hicks,* 531 F.3d 555, 561 (7th Cir. 2008), in affirming the district court's denial of a motion to suppress based on a tip that proved to be fabricated (tipster reported a nonexistent domestic dispute when in fact the

14

defendant was not assaulting anyone, but was illegally possessing a firearm when frisked), "any body of law requiring 911 operators to carefully make credibility determinations would unacceptably delay the necessary responses to all emergency calls, including genuine ones." *Id.* (emphasis in original).

### IV.     Plaintiff Has Failed to Name an Expert

Plaintiff's reply brief fails to address his requirement to proffer an expert to testify regarding the alleged failure on the part of the District to train or supervise its employees. To the extent Plaintiff has failed to address the latter issue, this court should treat the matter as conceded.

As to causation, Plaintiff provided supplemental discovery to Defendants *the day of the initial pre-trial conference*. The fact that Plaintiff had advised Defendants of complications related to obtaining medical records does not discharge Plaintiff of his duty to supplement discovery. Fed. Civ. P. 26(e)(2). This matter was initially filed in 2006 and certainly ample time has passed for Plaintiff to obtain his own medical records. Defendants should not be forced to defend against records that cannot be authenticated at trial and that were produced just shy of two weeks prior to trial.

Plaintiff mistakenly relies on *Hisler* for the proposition that he does not need a medical expert for the purpose of causation. Opp. at 25. *Hisler* dealt with an appeal of a worker's compensation claim. *Hisler v. District of Columbia Dep't of Employment Servs.*, 950 A. 2d 738 (D.C. 2008). In *Hisler, causation* was *not* an issue so the testimony of a treating physician was preferred over a medical expert who was not familiar with the plaintiff and retained solely for the purpose of litigation. *Id.* at 746. Here, causation is an issue and expert testimony is necessary because the causation and preexisting condition of Plaintiff are beyond

15

the knowledge of the average juror. *Williams v. Lucy Webb Hayes National Training School for Deaconesses and Missionaries*, 924 A.2d 1000, 1003 (D.C. 2007).

V.    CONCLUSION

**WHEREFORE**, based on the foregoing, Defendants respectfully request that this court grant their Motion In Limine.

Dated this 10th day of September, 2008.

>Respectfully submitted,
>
>PETER J. NICKLES
>Acting Attorney General for the District of Columbia
>
>GEORGE C. VALENTINE
>Deputy Attorney General, Civil Litigation Division
>
>*/s/ Toni Michelle Jackson*
>TONI MICHELLE JACKSON [453765]
>Chief, General Litigation Section III
>
>*/s/ Vanessa E. Atterbeary*
>VANESSA E. ATTERBEARY [478070]
>Assistant Attorney General
>441 Fourth Street, N.W., Suite 6S-070
>Washington, D.C. 20001
>(202) 727-9624
>(202) 727-3625 (fax)
>Email: Vanessa.Atterbeary@dc.gov
>
>*/s/ Shana L. Frost*
>SHANA L. FROST [45802]
>Assistant Attorney General
>441 Fourth Street, N.W., 6th Floor South
>Washington, D.C. 20001
>(202) 727-9624
>(202) 727-3625 (fax)
>Email: Shana.Frost@dc.gov